UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL FERGUSON,

    Plaintiff,

v.

WAYNE COUNTY AIRPORT AUTHORITY,

    Defendant.

_____/

Case No. 16-11415

SENIOR U.S. DISTRICT JUDGE
ARTHUR J. TARNOW

U.S. MAGISTRATE JUDGE ANTHONY
P. PATTI

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [14]**

43 year old Plaintiff Michael Ferguson, formerly an airport maintenance worker employed by Defendant Wayne County Airport Authority ("WCAA"), was injured in a car accident in late September 2011. After being on leave for approximately 17 months, Ferguson sought to return to work in February 2013. WCAA determined that he wasn't qualified for the position and terminated him on May 1, 2013. Ferguson filed this disability and gender discrimination lawsuit on April 19, 2016. WCAA filed a Motion for Summary Judgment [14] on September 5, 2017.

For the reasons discussed below, WCAA's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**. Genuine issues of material fact exist as to Ferguson's claim for disability discrimination – specifically, whether Ferguson is otherwise qualified to be an airport maintenance worker, with or without reasonable

accommodations. However, there is insufficient evidence for a reasonable factfinder to conclude that Ferguson was a victim of gender discrimination.

## FACTUAL BACKGROUND

Given that Defendant moves for summary judgment under Federal Rule of Civil Procedure 56, the facts and evidence are presented, and all reasonable inferences are drawn, in favor of Plaintiff. *See Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 648 (6th Cir. 2012).

Plaintiff began working at the Wayne County Airport Authority ("WCAA") as an airport maintenance worker in October 2005. Plaintiff's responsibilities included collecting garbage; airfield restoration, maintenance, and construction work; driving trucks; barricade installation, and cutting grass. Plaintiff was part of a seven-person crew that was assigned tasks by a specific foreman. The foremen generally permitted their crewmembers to pick job assignments based on seniority.

As an airport maintenance worker, Plaintiff was a member of a collective bargaining unit, AFSCME Local 101.[1] His employment was subject to the terms of the Collective Bargaining Agreement ("CBA").

Plaintiff was severely injured in a car accident in late September 2011. On October 11, 2011, when Plaintiff requested a leave of absence, he believed that he would be able to return to work on November 15, 2011. This turned out not to be the

---

[1] It appears that sometime between 2011 and 2013, the union changed from AFSCME Local 101 to AFSCME Local 953.

case, however, and his healthcare provider certified a leave of absence through December 6, 2011. Plaintiff's leave was ultimately extended through approximately February 2013. Pursuant to the CBA, Plaintiff's job was protected for 18 months.

Plaintiff first filed for Social Security Disability Benefits in October 2012.[2] Shortly thereafter, in December 2012 or January 2013, Plaintiff wanted to return to work.

On February 26, 2013, Plaintiff treated with Dr. Gary Chodoroff. Dr. Chodoroff opined that Plaintiff could work as an airport maintenance worker with restrictions, eight hours per day, 40 hours per week, starting on March 18, 2013. Dr. Chodoroff restricted Plaintiff from lifting more than 10 pounds and from bending to, or lifting from, below knee height. (Pl.'s Ex. 3, Pg. ID 369). Dr. Chodoroff also said that Plaintiff should be able to change positions as needed and that he should work an afternoon shift so that he could attend physical therapy appointments in the morning. Plaintiff conveyed this information to WCAA Human Resources Director Rosalind Wallace via email. (Pl.'s Ex. 12).

After hearing from Plaintiff, Wallace reached out to her superiors, then-Deputy Director of Landside Services Joseph McCabe, then-Deputy Director of Maintenance Bob Zwarka, and then-Director of Maintenance Angela Frakes. Wallace asked them to review Plaintiff's doctor's certification and determine whether Plaintiff's restrictions could be accommodated. Wallace didn't think that WCAA could "allow

---

[2] Plaintiff's claim was denied initially on January 17, 2013. (Pl.'s Ex. 21).

[Plaintiff] to return to work with these restrictions," but said that "[w]e should try to accommodate him if we can." *Id.*

McCabe did "not think that Field Maintenance can accommodate this" because "[m]ost, if not all of our jobs, involve some form of lifting, stooping, bending, climbing, etc." *Id.* Zwarka shared these concerns and said that if Plaintiff "can't bend his knees or climb this prevents him from being able to drive large equipment." *Id.*

Brad Manley, the president of AFSCME Local 953, wrote to Wallace on March 4, 2013. He asked Wallace to "indicate what restrictions prevent [Plaintiff] from performing the basic essential job duties within his classification." (Pl.'s Ex. 13). Manley emphasized that the Union sought fair treatment and accommodations for Plaintiff given that WCAA had previously allowed employees "with the same or similar restrictions to return to work with restrictions not related to a work injury with accommodations." *Id.* Wallace "did not respond in writing to Mr. Manley." (Def.'s Ex. X at 53:9).

Plaintiff filed a charge of discrimination with the EEOC on March 25, 2013. (Pl.'s Ex. 15). Shortly thereafter, he filed a written request for a Social Security Disability Benefits hearing. (Pl.'s Ex. 21).

On April 30, 2013, Manley told Wallace via email that Plaintiff was "able to take a Medical Demotion." (Pl.'s Ex. 14). He also indicated that there were "two positions open [Store Keeper or Service Worker] that would meet ADA Standards" and asked Wallace to explain why Plaintiff had not been considered for these jobs. *Id.*

Defendant terminated Plaintiff's employment via letter the following day. (Pl.'s Ex. 4). Plaintiff updated his EEOC claim to reflect the termination on June 6, 2013.

On October 1, 2014, the EEOC found that there was reasonable cause to believe that Plaintiff's rights had been violated. (Pl.'s Ex. 16). Approximately one week later, an Administrative Law Judge ("ALJ") concluded that Plaintiff was disabled from September 26, 2011 through March 31, 2014. (Pl.'s Ex. 21).

## **LEGAL STANDARD**

On a Rule 56 motion for summary judgment, the Court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). Defendant bears the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that Plaintiff lacks evidence to support an essential element of his case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue for trial exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## **ANALYSIS**

Plaintiff alleges that Defendant discriminated against him on the basis of his disability – in violation of the Americans with Disabilities Act ("ADA"), § 504 of the Rehabilitation Act, and the Michigan Persons with Disabilities Civil Rights Act

("PWDCRA") – and his gender, in violation of Title VII and the Elliot Larsen Civil Rights Act ("ELCRA").

## I. Disability Discrimination

The ADA, PWDCRA, and the Rehabilitation Act prohibit employers from discriminating against qualified individuals on the basis of disability. 42 U.S.C. § 12112(a); 29 U.S.C. § 794(a); M.C.L. § 37.1202. As the parties appear to agree, Plaintiff's ADA, PWDCRA, and Rehabilitation Act claims may be analyzed using the same standards. *A.C. ex rel. J.C. v. Shelby County Bd. of Educ.*, 711 F.3d 687, 697 (6th Cir. 2012) (ADA and Rehabilitation Act); *Donald v. Sybra*, 667 F.3d 757, 764 (6th Cir. 2012) (ADA and PWDCRA). Accordingly, Plaintiff's claims under the three acts are considered concurrently.

To establish a prima facie case of disability discrimination for failure to accommodate, Plaintiff must show that (1) he is an individual with a disability; (2) he is otherwise qualified for the position, with or without reasonable accommodation; (3) WCAA knew or had reason to know about his disability; (4) he requested an accommodation; and (5) WCAA failed to provide the necessary accommodation. *Johnson v. Cleveland City Sch. Dist.*, 443 Fed. Appx. 974, 982-83 (6th Cir. 2011). The parties dispute whether Plaintiff was qualified to perform the essential functions of an airport maintenance worker and whether Plaintiff's requested accommodations from WCAA were reasonable.

Once Plaintiff establishes a prima facie case, "the burden shifts to the employer to demonstrate that any particular accommodation would impose an undue hardship on the employer." *Id.*

### 1. Individualized Inquiry

"The ADA mandates an individualized inquiry in determining whether an employee's disability or other condition disqualifies him from a particular position." *Holiday v. City of Chattanooga*, 206 F.3d 637, 643 (6th Cir. 2000). The employer must consider the employee's personal characteristics, his actual medical condition, and the effect, if any, the condition may have on his ability to perform the job in question. *Id.* "The ADA requires employers to act, not based on stereotypes and generalizations about a disability, but based on the actual disability and the effect that disability has on the particular individual's ability to perform the job." *Keith v. City of Oakland*, 703 F.3d 918, 923 (6th Cir. 2013).

There's nothing in the record to show that WCAA conducted an individualized inquiry into Plaintiff's medical condition. After Plaintiff provided Wallace with information about his current abilities, Wallace reached out to McCabe, Zwarka, and Frakes for their thoughts about accommodating Plaintiff's restrictions. Aside from a few cursory email conversations, WCAA "made no effort to determine whether, despite his [restrictions], [Plaintiff] could nonetheless perform the essential functions of the position, either with or without reasonable accommodation." *Id.* at 924. No one from WCAA spoke with Plaintiff about his injuries and restrictions, nor did anyone

consult Dr. Chodoroff, Plaintiff's doctor. Additionally, WCAA never gave Plaintiff the opportunity to demonstrate his abilities.

### 2. Otherwise Qualified

Plaintiff is "otherwise qualified" to be an airport maintenance worker if he "can perform the 'essential functions' of the job, with or without accommodation." *Johnson*, 443 Fed. Appx. at 983 (quoting 42 U.S.C. § 12111(8)). "Essential functions" are "the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1). A job function is essential "if its removal would 'fundamentally alter' the position." *Kiphart v. Saturn Corp.*, 251 F.3d 573, 584 (6th Cir. 2001).

"Whether a job function is essential is a question of fact that is typically not suitable for resolution on a motion for summary judgment." *Keith*, 703 F.3d at 926. The determination "is evaluated on a case-by-case basis by examining a number of factors." *Rorrer v. City of Stow*, 743 F.3d 1025, 1039 (6th Cir. 2014). These factors include:

> (i) The employer's judgment as to which functions are essential; (ii) Written job descriptions prepared before advertising or interviewing applicants for the job; (iii) The amount of time spent on the job performing the function; (iv) The consequences of not requiring the incumbent to perform the function; (v) The terms of a collective bargaining agreement; (vi) The work experience of past incumbents in the job; and/or (vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3)(i)-(vii).

The two job descriptions in the record[3] indicate that airport maintenance workers "use a wide array of tools and motorized equipment to complete maintenance work on the airfields." (Def.'s Ex. A). They "operate and service a variety of power mobile [and] general maintenance equip[ment]," "[p]erform[ ] general maintenance and construction work," and assist WCAA Emergency Management Division, Public Safety Division, and Facilities Maintenance and Fleet Services as needed. *Id.*; *see also* Pl.'s Ex. 9.

Airport maintenance workers must be able to sit, stand, and walk frequently. Employees are constantly driving motor vehicles and very frequently drive heavy equipment. The employee must be able to lift light loads (0-14 pounds) and moderate loads (15-50 pounds) frequently, between roughly six and 19 hours per week. (Pl.'s Ex. 9). The employee must also be able to bend, squat, reach, grasp, and hold objects at almost all times. *Id.*

Joseph McCabe, Plaintiff's former supervisor, and Plaintiff provided similar testimony about the duties of an airport maintenance worker. McCabe referred to the position as a "jack of all trades." (Def.'s Ex. Y at 17:13-14). McCabe said that generally, before operating any type of vehicle, the individual has to "do a pre-inspection, make sure everything is in operating order, [and ensure that there are] no issues prior to going out on to the airfield." *Id.* at 21:19-22. During the pre-check,

---

[3] One job description appears to be from 2003 and the other is from 2011. *See* Def.'s Ex A; Pl.'s Ex. 9. Plaintiff has also provided the Court with a list of an airport maintenance worker's principle duties and responsibilities. *See* Pl.'s Ex. 8. This list is neither dated nor signed, and there's no indication of where this list is from or who created it.

"there are hatches or doors that have to be lifted in order to check the gauges and dipsticks." *Id.* at 25:1-3. However, "[o]nce [the person] is in the vehicle[,] it's mainly driving and operating." *Id.* at 21:22-23. McCabe noted that workers frequently "run into issues . . . with equipment" and that "they have got to be able to get out, check on things, let [the] foreman know what's going on." *Id.* at 22:6-8. In addition, depending on the particular task, the operator might have to fill his truck with certain fluids, which would require him to "open up a couple valves, start the motor, and then hook [ ] hoses to the [ ] tank [and] the . . . intake valve." *Id.* at 29:16-22.

Plaintiff said that, in addition to driving and operating large vehicles, he mixed, displaced, and finished cement, which required some bending. On occasion, he had to lift 80 pound bags of cement. (Def.'s Ex. W at 49:5-10). Plaintiff finished cement using hand trowels or aluminum floats, which weighed a few pounds each.

Plaintiff also collected garbage, repaired fences and signs, cut grass, and removed snow. Plaintiff collected garbage using a hand picker and a garbage bag or pail, which weighed an estimated several pounds combined. Plaintiff either walked around picking up trash or drove a truck, which was used to get to and from the job and from one site to the other. *Id.* at 43-44.

Fence repair required Plaintiff to survey the damage to the fence, drive to the maintenance yard, gather the necessary repair materials, and fix the fence as needed. *Id.* at 55:11-18. Plaintiff did patchwork and replaced entire sections of fences using hand tools, front end loaders, ladders, barbed wire, poles, latches, fence ties, gravel,

cement, and posthole diggers. *Id.* at 56:13-14. Fence repair typically entailed picking up 10-20 pounds' worth of equipment and loading it into trucks.

Plaintiff cut grass using a variety of equipment. Some jobs – especially those close to the buildings – only required the use of an ordinary lawnmower. *Id.* at 10-15. Others required the use of tractors, flail mowers, slope cutting machines, and weed whips. Weed whips weighed approximately 10 pounds. Plaintiff also used handheld blowers that weighed five or six pounds each.

During snow removal, Plaintiff operated a Vammas, which is "like a Greyhound bus . . . [that] has a front plow blade that's 30 feet wide and a brush on the back that's 25 feet wide." *Id.* at 60:11-23. Plaintiff worked in the Vammas for up to 12 hours. Plaintiff maintained and did basic repairs of the Vammas when needed. He also "assisted in changing out the brush." *Id.* at 65:2.

Plaintiff also did signage repair and barricade maintenance. Erecting a sign required occasional lifting. Smaller signs weighed approximately 10 pounds. Plaintiff removed and replaced damaged barriers as needed. Machines did all the lifting. *Id.* at 69:10-11.

Much of Defendant's argument as to why Plaintiff is not qualified to be an airport maintenance worker hinges on the fact that Plaintiff told the Social Security Administration ("SSA") that his condition was deteriorating, and was granted Social Security Disability Benefits based on this representation. Supreme Court and Sixth Circuit case law indicate that the receipt of Social Security benefits doesn't

necessarily prevent a plaintiff from showing that he is qualified to perform the essential functions of the position. *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 807 (1999). Rather, Plaintiff must sufficiently explain "how he can perform the essential functions of the job, given the Social Security Administration's determination of total disability." *Olds v. United Parcel Service, Inc.*, 127 Fed. Appx. 779, 783 (6th Cir. 2005). The Sixth Circuit has noted that the SSA "assesses only what a claimant can do, while the relevant inquiry under the ADA asks what the claimant can do *with or without accommodation*." *Id.* (emphasis in original). As the Supreme Court explained,

> To defeat summary judgment, [Plaintiff's] explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement [to the SSA], the plaintiff could nonetheless 'perform the essential functions' of [the] job, with or without 'reasonable accommodation.'

*Cleveland*, 526 U.S. at 807.

Plaintiff suggests that he could have collected garbage, driven and operated vehicles, and been assigned to signage repair work. He notes that his seniority status, as well as the discretion of the foremen, would allow him to choose job assignments that fit his restrictions.

McCabe stated that the foremen are generally "given complete discretion" when determining "who is assigned to what position or what task for the day." (Def.'s Ex. Y at 18:11-15). McCabe acknowledged that while the official policy prohibits

foremen from assigning jobs to crewmembers based on seniority, the foremen may have done so "outside of [his purview]." *Id.* at 67:2-5.

The crux of the parties' dispute is whether Plaintiff was physically capable of performing the essential functions of an airport maintenance worker. Both McCabe and Plaintiff testified that much of the job entails driving and operating large vehicles, which, the record seems to show, Plaintiff could do without any problem. With respect to garbage collection, Plaintiff said that, due to his high seniority, he often just drove the truck, rather than walking around and picking up garbage. (Def.'s Ex. W at 42:7-16). Similarly, for asphalt work, Plaintiff's seniority allowed him to choose "to drive the truck to the asphalt plant to pick up the asphalt to deliver it to the job." *Id.* at 53:11-16.

Defendant takes an unfairly narrow view of Plaintiff's restrictions. The evidence shows that there is a fact question as to whether or not Plaintiff could perform the essential functions of his job. For example, Dr. Chodoroff didn't say that Plaintiff was completely prohibited from bending or lifting; rather, he recommended that Plaintiff shouldn't bend to, or lift from, below knee height. And, although Plaintiff is prohibited from lifting more than 10 pounds, Plaintiff described numerous tasks that fit this restriction. Plaintiff could collect garbage with tools that weighed several pounds combined, finish cement, cut grass, maintain barricades, and use lawn maintenance equipment.

Importantly, Plaintiff's restrictions seemingly have no impact on his ability to drive and operate large vehicles, which McCabe said was a significant part of the job. (Def.'s Ex. Y at 21:22-23). Moreover, as discussed more in depth below, the crew foreman had significant discretion with job assignments, and many of them assigned jobs based on a crewmember's seniority level. Plaintiff's and McCabe's testimony indicates that the foremen had the flexibility to assign Plaintiff to tasks that met his physical restrictions. A jury could reasonably interpret this information to mean that Plaintiff can perform airfield maintenance and restoration work despite his restrictions.

### 3. With or Without Reasonable Accommodation

"When accommodation is necessary to enable a plaintiff to perform the essential functions of the position in question, it is the plaintiff's burden to propose an accommodation that is 'objectively reasonable.'" *Keith*, 703 F.3d at 927 (citing *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 870 (6th Cir. 2007)). Plaintiff must show "that the accommodation is reasonable in the sense both of efficacious and of proportional to costs." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1183 (6th Cir. 1996) (quoting *Vande Zande v. State of Wisconsin Dep't of Admin.*, 44 F.3d 538, 543 (7th Cir. 1995)). WCAA can "escape liability if [it] can carry the burden of proving that a disability accommodation reasonable for a normal employer would break [it]." *Id.* (citing *Vande Zande*, 44 F.3d at 543). "The reasonableness of a requested accommodation is generally a question of fact." *Id.*

Plaintiff told WCAA that he could work, provided that he didn't have to lift more than 10 pounds, bend or lift from below knee height, work more than eight hours per day, and be allowed to change positions after approximately 65 minutes. Viewing the record evidence in the light most favorable to Plaintiff, a jury could find that these restrictions are objectively reasonable. These restrictions don't cost WCAA anything; Plaintiff is able to drive and operate large motor vehicles, which is already a significant part of his job. And, although the foremen may have to rearrange some job assignments, "[t]he ADA includes 'job restructuring' among its enumeration of reasonable accommodations." *Keith*, 703 F.3d at 927 (citing 42 U.S.C. § 12111(9)(B)). "[A]lthough the ADA does not require the shifting of essential functions, the ADA 'requires an employer to restructure the marginal functions of a job as a reasonable accommodation.'" *Id.* at 927-28 (quoting *Holbrook v. City of Alpharetta*, 911 F.Supp. 1524, 1542 (N.D. Ga. 1995)).

When he wasn't operating motor vehicles, Plaintiff collected garbage, repaired fences, erected signs, and maintained the airport property. Most of the tools he used to complete these tasks did not weigh more than 10 pounds. In addition, the foremen had considerable flexibility in assigning crewmember to specific tasks, and they often did so based on a person's seniority status.

Plaintiff has shown that the proposed modifications would allow him to effectively do his job at little or no cost to WCAA. Based on Plaintiff's and McCabe's testimony, it doesn't seem like much about Plaintiff's job would change. Thanks to

the discretion of the foremen and his seniority, Plaintiff already spent a great deal of time driving and operating large vehicles, and/or doing less labor intensive job assignments. Viewing this information in the light most favorable to Plaintiff, a reasonable jury could find that the proposed restrictions are objectively reasonable.

### 4. Interactive Process

"The duty to engage in the interactive process with a disabled employee is mandatory and 'requires communication and good-faith exploration of possible accommodations.'" *Id.* at 928 (quoting *Kleiber*, 485 F.3d at 871). This process is meant to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome these limitations." *Kleiber*, 485 F.3d at 871 (citing 29 C.F.R. § 1630.2(o)(3)).

Plaintiff eagerly reached out to WCAA in an effort to return to work. Brad Manley, the union president, also contacted WCAA on Plaintiff's behalf. Although WCAA responded to Plaintiff, it did not respond to the Union's inquiries, nor did it engage in any sort of substantive evaluation of Plaintiff's claims. It appears that the decision to deny Plaintiff the chance to return to work was made very quickly via email, without any meaningful review. This cursory decision-making process completely ignores the requirements of the ADA and deprived Plaintiff of "a fair opportunity to respond to the concerns surrounding his employment." *Id.* at 929.

## II. Gender Discrimination

Plaintiff's gender-based discrimination claims arise under Title VII and Michigan's ELCRA, which "are analyzed under the same evidentiary framework." *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004). Both statutes prohibit employers from discriminating against employees on the basis of sex. 42 U.S.C. § 2000e-2(a)(1); M.C.L. § 37.2101.

To establish a prima facie case of gender discrimination, Plaintiff must show that he: (1) is a member of a protected class, (2) was subject to an adverse employment action, (3) was qualified for the job, and (4) was treated differently than similarly situated female employees for the same or similar conduct. *Williams v. Serra Chevrolet Automotive, LLC*, 4 F.Supp. 3d 865, 874 (E.D. Mich. 2014).

Plaintiff essentially claims that non-disabled women routinely received less physically intensive job assignments. He contends that these women were assigned to perform tasks that were consistent with his restrictions.

Plaintiff named several female colleagues – Melanie Wartonen, Jamie Lewis, Kathy Belicki, and Sarah Shepard – who were allegedly accommodated based on their restrictions. Wartonen, for instance, was permitted "to drive the pesticide truck around all day while the pesticide guy sprayed weeds." (Def.'s Ex. W at 116:22-23). "That was her job for as long as she needed it." *Id.* at 116:24. Lewis and Belicki were also permitted to drive trucks and generally avoided physical labor. *Id.* at 118:2-3, 121:20-22. Finally, Shepard "took another position to stay on staff at the stock room." *Id.* at

123:5-6. Plaintiff acknowledged that he was "unaware of any specific medical restriction that any of these [women] had." *Id.* at 123:19-21.

Plaintiff's gender discrimination claims cannot withstand summary judgment. Plaintiff hasn't presented sufficient evidence to show that a) he was treated differently than his female colleagues, or that b) he was similarly situated to his female colleagues. Plaintiff has not shown that Wartonen, Lewis, Belicki, or Shepard "dealt with the same supervisor, [were] subject to the same standards and [ ] engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992) (internal citations omitted).

## CONCLUSION

For the reasons discussed above,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment [14] is **GRANTED IN PART** and **DENIED IN PART**. Because genuine issues of material fact exist as to whether Plaintiff is otherwise qualified to be an airport maintenance worker, with or without reasonable accommodations, Defendant's Motion is denied with respect to Plaintiff's disability discrimination claim. The Motion is otherwise granted.

**SO ORDERED**.

s/Arthur J. Tarnow
Arthur J. Tarnow
Dated: May 8, 2018    Senior United States District Judge